[Cite as *State v. Carnahan*, 2019-Ohio-3217.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF WAYNE | ) | |

| STATE OF OHIO | C.A. No. 18AP0029 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| ARRON MICHAEL CARNAHAN | WAYNE COUNTY MUNICIPAL COURT COUNTY OF WAYNE, OHIO |
| Appellant | CASE No. 2017 CR-B 001659 |

DECISION AND JOURNAL ENTRY

Dated: August 12, 2019

TEODOSIO, Presiding Judge.

{¶1} Appellant, Arron Michael Carnahan, appeals from his conviction for domestic violence in the Wayne County Municipal Court. This Court affirms.

I.

{¶2} Mr. Carnahan and the victim ("K.C.") were married and living together in Orrville with their three children. On September 7, 2017, the couple became engaged in an argument with each other over K.C.'s decision to go out with her friends that evening. K.C. returned home later that night and slept on the couch. The following morning, the argument briefly resumed until the children were sent off to school. Once the children were gone, the argument turned physical after Mr. Carnahan demanded K.C.'s car keys and she refused. K.C. eventually called 911 and police responded to the scene. K.C. was later transported to the emergency room by ambulance and was treated for her injuries.

**{¶3}** Mr. Carnahan was charged with one count of domestic violence, a misdemeanor of the first degree. Following a bench trial, the trial court found him guilty and ordered a pre-sentence investigation report. The court later sentenced him to 180 days in jail and ordered him to pay a $750.00 fine and court costs. Mr. Carnahan never sought a stay of execution of his sentence pending appeal. He has since completed his jail sentence, but has not yet paid his fine or court costs.

**{¶4}** Mr. Carnahan now appeals from his conviction and raises two assignments of error for this Court's review.

## II.

**{¶5}** As a preliminary matter, we must first address the State's contention that this appeal is moot because Mr. Carnahan has completed his sentence. "As a general rule, courts will not resolve issues which are moot." *Boncek v. Stewart*, 9th Dist. Summit No. 21054, 2002-Ohio-5778, ¶ 10. *See also Cleveland Hts. v. Lewis*, 129 Ohio St.3d 389, 2011-Ohio-2673, ¶ 18 ("[I]t is reversible error for an appellate court to consider the merits of an appeal that has become moot after the defendant has voluntarily satisfied the sentence * * *."). "A case is moot if it involves 'no actual genuine controversy which can definitely affect the parties' existing legal relationship.'" *State v. Ross*, 9th Dist. Lorain No. 18CA011284, 2019-Ohio-323, ¶ 6, quoting *Harris v. Akron*, 9th Dist. Summit No. 24499, 2009-Ohio-3865, ¶ 7.

**{¶6}** The Supreme Court of Ohio has held:

> Where a defendant, convicted of a criminal [misdemeanor] offense, has voluntarily paid the fine or completed the sentence for that offense, an appeal is moot when no evidence is offered from which an inference can be drawn that the defendant will suffer some collateral disability or loss of civil rights from such judgment or conviction.

*State v. Wilson*, 41 Ohio St.2d 236 (1975), syllabus. *See also State v. Berndt*, 29 Ohio St.3d 3, 4 (1987); *State v. Golston*, 71 Ohio St.3d 224, 227 (1994) ("[T]he test for mootness outlined in *Wilson* and *Berndt* applies only to appeals from misdemeanor convictions."). This Court has likewise held:

> [W]hen an appellant completes a misdemeanor sentence without requesting a stay pending appeal and does not offer evidence from which this Court could infer that the appellant would suffer collateral disability or loss of civil rights stemming from the misdemeanor conviction, the appeal is moot.

*State v. Boone*, 9th Dist. Summit No. 26104, 2013-Ohio-2664, ¶ 7. "A collateral disability is an adverse legal consequence of a conviction or judgment that survives despite the court's sentence having been satisfied or served." *In re S.J.K.*, 114 Ohio St.3d 23, 2007-Ohio-2621, ¶ 10. It need not have an immediate impact or impairment but may be something that occurs in the future. *Id.* at ¶ 14.

{¶7} On April 19, 2018, Mr. Carnahan was sentenced to 180 days in jail. He never sought a stay of execution and was instead delivered to the jail to begin serving his sentence. He later completed his jail sentence on August 27, 2018, when he was released from custody with credit for good time served. The State argues that Mr. Carnahan's appeal is thus moot because he has voluntarily completed his jail sentence. We note that Mr. Carnahan has not filed a reply brief refuting the State's assertion or arguing the existence of any collateral disability. *See, e.g., In re B.G.*, 9th Dist. Summit No. 24428, 2009-Ohio-1493, ¶ 13. *See also Berndt* at 4, quoting *Wilson* at 237 ("'The burden of presenting evidence that he has such a 'substantial stake in the judgment of conviction' is upon the defendant.'").

{¶8} Regardless, our review of the record reveals that while Mr. Carnahan has indeed completed his jail sentence, he has not yet paid his $750.00 fine or court costs. Although an appellant may have completed the incarceration portion of his sentence, the failure to also pay

fines or court costs in a misdemeanor case has been deemed sufficient by Ohio appellate courts to preclude a determination that an appeal is moot. *See State v. Nared*, 2d Dist. Clark No. 2017-CA-3, 2017-Ohio-6999, ¶ 12 (rejecting a mootness argument when the appellant completed the jail sentence, but had not yet paid outstanding court costs); *State v. Cart*, 11th Dist. Trumbull No. 2008-T-0120, 2009-Ohio-4621, ¶ 9, fn. 2. (determining an appeal was not moot when the appellant completed the jail sentence, but had not yet paid the outstanding fine); *State v. Hoff*, 5th Dist. Fairfield No. 02-CA-89, 2003-Ohio-3858, ¶ 12 (rejecting a mootness argument when the appellant completed the jail sentence, but had not yet paid outstanding court costs); *State v. Bailey*, 8th Dist. Cuyahoga No. 76190, 2000 WL 504108, \*2 (Apr. 27, 2000) (determining an appeal was not moot when the appellant completed the jail sentence, but had not yet paid the outstanding fine).

{¶9} We therefore conclude that Mr. Carnahan's appeal is not moot, and now turn to address the merits of his appeal. For ease of analysis, we will consolidate his assignments of error.

## ASSIGNMENT OF ERROR ONE

MR. CARNAHAN'S CONVICTION FOR DOMESTIC VIOLENCE IS NOT SUPPORTED BY SUFFICIENT EVIDENCE.

## ASSIGNMENT OF ERROR TWO

MR. CARNAHAN'S CONVICTION FOR DOMESTIC VIOLENCE IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶10} In his assignments of error, Mr. Carnahan argues that his domestic violence conviction was not based on sufficient evidence and was against the manifest weight of the evidence. We disagree with both propositions.

**{¶11}** Although he has challenged both the sufficiency and weight of the evidence in separate assignments of error, the substance of both arguments focuses primarily on the manifest weight of the evidence. He indeed broadly questions "whether a rational trial of fact could have found the essential elements proven beyond a reasonable doubt," but he mainly argues that there were "two conflicting stories" presented at trial and claims that his own story was *more* consistent with the evidence. He also challenges K.C.'s credibility, contending that she suffered only minor injuries, which were inconsistent with the emergency room doctor's observations.

**{¶12}** "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Whether a conviction is supported by sufficient evidence is a question of law, which this Court reviews de novo. *Id.* Sufficiency concerns the prosecution's burden of production and tests whether adequate evidence was presented for the case to go to the jury. *See id.* "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. However, "we do not resolve evidentiary conflicts or assess the credibility of witnesses, because these functions belong to the trier of fact." *State v. Hall*, 9th Dist. Summit No. 27827, 2017-Ohio-73, ¶ 10.

**{¶13}** Regarding the manifest weight of the evidence, this Court has stated:

In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "[W]hen reversing a conviction on the basis that it was against the manifest weight of the evidence, an appellate court sits as a 'thirteenth juror,' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Tucker*, 9th Dist. Medina No. 06CA0035-M, 2006-Ohio-6914, ¶ 5. This discretionary power "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). *See also Otten* at 340.

{¶14} Mr. Carnahan was convicted of domestic violence under R.C. 2919.25(A), which states: "No person shall knowingly cause or attempt to cause physical harm to a family or household member." "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). "'Physical harm to persons' means any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). A "family or household member" includes a spouse who is residing with the offender. R.C. 2919.25(F)(1)(a)(i).

{¶15} Both Mr. Carnahan and K.C. testified at trial that they were married and living together at the time of the incident. They both agreed that an argument occurred the night of September 7, 2017, at their home in Orrville. K.C. testified that she was going out to dinner with two friends, but Mr. Carnahan was upset about it. She went out anyway and later returned home to sleep on the couch. Mr. Carnahan testified that he was watching an NFL game when K.C. asked him what he wanted for his birthday tomorrow. He first replied, "[A]ll I want is you," but then decided he wanted pumpkin pie instead. He testified that, when K.C. said she was going out drinking with her friends, he asked her about some money that had been withdrawn from his

account. He testified that K.C. "snapped[,]" pulled him off of the couch onto the floor, and began "thrashing" him around. He further testified that K.C. had previously hit him on other occasions, and he would defend himself, although "probably not the right way * * *." He never called the police on her, however, because he claimed she makes a lot more money than him and she would lose her job.

{¶16} K.C. testified that she awoke the next morning when Mr. Carnahan kicked her, called her a "c**t[,]" and told her to get the kids ready. Mr. Carnahan testified that he did not kick K.C., but only "nudged" her and "rubbed her, like, kind of rocked her shoulder with [his] hand" while she was asleep on the couch, and then simply suggested that she get up. K.C. testified that another verbal altercation ensued, in which their voices were raised, before she got the children ready for school. Mr. Carnahan testified that there was only an "exchange of words" in which K.C. blamed him for taking her phone, but he denied that their voices were raised. During that exchange, he testified that she punched him in the nose. He testified that his response to being punched was simply to say, "Damn, nice shot[,]" to which she replied, "Thank you."

{¶17} After the children left for school, K.C. testified that she went into her bedroom, shut the door, and laid on the bed quietly while waiting for Mr. Carnahan to leave for work. Mr. Carnahan entered the bedroom briefly to verbally harass K.C. again while she pretended to be asleep, before he went back to the kitchen to call his employer. He soon returned, however, and demanded K.C.'s car keys, which she claimed he had never asked for before. Both parties testified that Mr. Carnahan had his own vehicle. K.C. testified that Mr. Carnahan was in her face screaming at her and spitting on her. Mr. Carnahan, however, testified that he had decided to go out to breakfast because it was his birthday, so he asked K.C. for the keys to her car. When she

told him no and said he should use his own car, he simply replied, "[O]kay. Thank you[,]" and left the room.

{¶18} K.C. testified that after she refused to give him her keys Mr. Carnahan grabbed her by the leg to "rip" her out of bed while she held onto it. She tried to kick him off of her, but "it escalated very fast from there." Mr. Carnahan tried to flip the mattress up, so K.C. would fall out of bed, but it became "shoved up against the wall with [her]." K.C. testified that Mr. Carnahan was then on top of her with his knee in her throat and his hands over her face, and she could not breathe. She admitted to urinating all over herself at some point. After he let her go, she told him he was going to kill her, and he responded, "B***h, I'm trying to kill you." K.C. testified that she broke Mr. Carnahan's glasses and fled from the bedroom. Mr. Carnahan testified, however, that he decided to go get the keys from her anyway, so he returned to the bedroom, but K.C. was ignoring him while on her phone. When he grabbed her phone so she would acknowledge him, K.C. "thr[ew him] up against [the] dresser * * *." At that point, it turned into a "circus" as she grabbed him by the shirt and bent his glasses. He denied ever having his knee on her throat, covering her face with his hands, or choking her. According to Mr. Carnahan, K.C. started pushing him, so he got on top of the bed "[b]ecause she was trying to beat the s**t out of [him]." He testified that he was not afraid, but was "afraid of getting [his] a** kicked."

{¶19} K.C. testified that she fled the bedroom and Mr. Carnahan chased her. She turned around at some point, and he pushed her to the floor in the living room. When she hit the floor, Mr. Carnahan jumped on top of her and kneed her in the rib cage. She testified that she "was writhing in pain[,] could not move[,] and could not breathe." She believed her lung had been punctured. Contrarily, Mr. Carnahan testified that he was the one who fled the bedroom, but in

order to escape he had to pick up the mattress and pin K.C. between the mattress and the dresser. He testified that he was only "trying to defend [him]self and get away from her." K.C. then pursued him out of the room and was grabbing his shirt. While heading toward the living room, the two became tangled in a "free spin[.]" As Mr. Carnahan fell backwards, he curled up into a fetal position to block her from landing on him, but she landed directly on top of him.

{¶20} They both testified that Mr. Carnahan took K.C.'s purse and began looking through it for the car keys. K.C. testified that she went into the bathroom, and Mr. Carnahan dumped out the contents of her purse on top of her. Mr. Carnahan testified that he merely dumped the contents of her purse onto the bathroom floor. K.C. called 911 in the bathroom because she "really thought that [she] wasn't going to get out of there alive that day * * *."

{¶21} Deputy Steven Browning of the Wayne County Sheriff's Office ("WCSO") testified that, when he arrived at the scene, K.C. was crying, scared, visibly shaken, and had difficulty speaking. He observed a mark under her chin, and K.C. complained to him that her ribs were hurting her. The deputy soon spoke to Mr. Carnahan, who claimed K.C. "came at him" during an argument, broke his glasses, and punched him, which gave him a "fat lip" and a bloody nose. The deputy also noticed a cut over Mr. Carnahan's right temple. He asked Mr. Carnahan if he had said anything about killing K.C., and testified that Mr. Carnahan responded as follows: "If he wanted to kill her it would not be that difficult, I believe is how he phrased it." Deputy Browning testified that both Mr. Carnahan and K.C. were investigated for domestic violence that day, but he was unable to determine a primary aggressor. Although both individuals could have been arrested, neither one was arrested because Mr. Carnahan agreed to leave the home for the day. Following Mr. Carnahan's testimony, Deputy Browning testified in rebuttal that Mr.

Carnahan did not provide him with any details on the day of the incident beyond K.C. punching him in the nose and bending his glasses.

{¶22} Sergeant Eric Peters of the WCSO responded to the scene that day as well. He testified that Mr. Carnahan told him he argued with K.C. over car keys and she punched him in the nose. Mr. Carnahan also said K.C. was a "psycho." When the sergeant asked Mr. Carnahan why K.C. punched him in the nose, he did not give an answer. When K.C. was asked the same question, she told the sergeant it was because she was being attacked. The sergeant testified that although it was difficult to determine, he believed K.C. was the primary aggressor in the September 7th argument, but Mr. Carnahan was the primary aggressor for the September 8th incident. He went to the hospital afterward to speak to K.C., and testified that her statement that day was consistent with her testimony at trial. Following Mr. Carnahan's testimony, Sergeant Peters testified in rebuttal that Mr. Carnahan never reported to him that K.C. had attacked him in any way beyond punching him in the nose. He further testified that "pretty much [Mr. Carnahan's] entire [testimony] of what occurred in the bedroom and out into the living room" was all new information that was never provided to the sergeant back on September 8th.

{¶23} After the police arrived at the scene, K.C. was transported by ambulance to the hospital. Pictures of some visible injuries to K.C.'s neck and chin were introduced into evidence at trial. Dr. Ross Campensa was the emergency room physician who examined her that day. He testified that she appeared to be in pain, and he found "tenderness in her right rib cage area" and "an abrasion by the neck area." He diagnosed her with a "right chest wall rib contusion strain," but could not recall if he diagnosed the abrasion. He conceded that K.C.'s injuries could have possibly been caused by something other than assault, but also testified that swelling and other symptoms of either strangulation or a knee to the throat could present days after the incident.

K.C. testified that she was in "bad" pain in the days following the incident and could not lie down flat to sleep. She also could not take deep breaths due to the pain in her side. A bruise a little larger than the size of a grapefruit appeared on her side and remained there for weeks.

{¶24} Based on our review of the record and the evidence presented at trial, we conclude that the State presented sufficient evidence, if believed, to establish that Mr. Carnahan committed the offense of domestic violence. The trial court could have reasonably determined that the State proved each and every element of the offense beyond a reasonable doubt.

{¶25} Moreover, we cannot conclude that the trier of fact clearly lost its way and created a manifest miscarriage of justice. Although two sharply conflicting stories were indeed presented at trial, "'the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts.'" *State v. Haydon*, 9th Dist. Summit No. 27737, 2016-Ohio-4683, ¶ 28, quoting *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Mr. Carnahan argues that his testimony was *more* consistent with the evidence presented, but we cannot say the trial court erred in choosing to believe K.C.'s version of events over Mr. Carnahan's. The trial court was best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use those observations in weighing the credibility of the proffered testimony. *See State v. Cook*, 9th Dist. Summit No. 21185, 2003-Ohio-727, ¶ 30. The court explicitly stated that it found K.C.'s testimony to be "highly credible." Contrarily, the court did not find Mr. Carnahan's testimony credible at all, and stated: "[O]ne aspect that the [c]ourt believed about the defendant's testimony is that he woke up that morning. Other than that, a vast majority of what [he] said were things that [he] didn't recount with the deputies. It seemed to be made up. [He] seemed to be making it up as [he's] testifying." This Court has consistently held that "[w]e will not overturn a conviction as being against the manifest weight

of the evidence simply because the trier of fact chose to believe the State's version of events over another version." *State v. Fry*, 9th Dist. Medina No. 16CA0057-M, 2017-Ohio-9077, ¶ 13.

{¶26} We further find no merit in Mr. Carnahan's challenge to K.C.'s credibility by arguing that K.C. suffered only minor injuries, which were inconsistent with both her version of the events as well as the emergency room doctor's observations. As we noted earlier, "physical harm" includes any injury "regardless of its gravity or duration." R.C. 2901.01(A)(3). "It does not require injury of a magnitude that leaves physical marks on the victim, and physical harm can be established by the victim's testimony." *State v. Barlow*, 9th Dist. Lorain No. 18CA011313, 2019-Ohio-582, ¶ 22. Thus, the gravity of K.C.'s injuries was inconsequential. A review of the record reveals that her reported injuries were not inconsistent with her testimony, the deputies' testimony, the doctor's testimony, and the photographs entered into evidence.

{¶27} In reviewing the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of witnesses, we cannot say that the trial court, in resolving any conflicts in the evidence, clearly lost its way and created a manifest miscarriage of justice. *See Otten* at 340. Mr. Carnahan has also not demonstrated how this is an exceptional case where the evidence presented weighs heavily in his favor and against conviction. *See Thompkins* at 387.

{¶28} Overall, we conclude that Mr. Carnahan's conviction for domestic violence was not based on insufficient evidence and was not against the manifest weight of the evidence. His first and second assignments of error are therefore overruled.

### III.

{¶29} Mr. Carnahan's first and second assignments of error are overruled. The judgment of the Wayne County Municipal Court is affirmed

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Wayne County Municipal Court, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

THOMAS A. TEODOSIO
FOR THE COURT

HENSAL, J.
SCHAFER, J.
CONCUR.

APPEARANCES:

WESLEY A. JOHNSTON, Attorney at Law, for Appellant.

DANIEL R. LUTZ, Prosecuting Attorney, and ANDREA D. UHLER, Assistant Prosecuting Attorney, for Appellee.